1

2

3

4                     UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   BRITTANY CHILDRESS,                    Case No.  13-cv-03252-JSC

8               Plaintiff,
        v.                                 **ORDER GRANTING PLAINTIFF'S**
9                                          **MOTION FOR SUMMARY JUDGMENT**
    CAROLYN W. COLVIN,                     **IN PART AND REMANDING CLAIM**
10                                         **FOR FURTHER PROCEEDINGS BY**
    Acting Commissioner of Social Security, **ADMINISTRATIVE LAW JUDGE**
                  Defendant.
11

12          Plaintiff Brittany Childress, proceeding *pro se*, brings this action pursuant to 42 U.S.C.

13   section 405(g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the

14   Commissioner of the Social Security Administration, denying Plaintiff's application for disability

15   benefits.  Now pending before the Court is Plaintiff's motion for summary judgment and

16   Defendant's cross-motion for summary judgment.  (Dkt. Nos. 30, 32.)  After carefully considering

17   the parties' submissions, the Court finds that the Administrative Law Judge ("ALJ") failed to

18   articulate clear and convincing reasons for rejecting Plaintiff's pain testimony, and therefore

19   GRANTS Plaintiff's motion for summary judgment in part, DENIES Defendant's cross-motion

20   for summary judgment, and REMANDS for a new hearing consistent with this Order.

21                                **LEGAL STANDARD**

22          A claimant is considered "disabled" under the Social Security Act if she meets two

23   requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

24   First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

25   reason of any medically determinable physical or mental impairment which can be expected to

26   result in death or which has lasted or can be expected to last for a continuous period of not less

27   than 12 months."  42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be

28   severe enough that she is unable to do her previous work and cannot, based on her age, education,

and work experience "engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

In December 2009, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, respectively. (AR 79, 87.)  Plaintiff alleged disability beginning December 14, 1990, the date of her birth, caused by scoliosis, arthritis, a prolapsed mitral valve, and Marfan's Syndrome.  (AR 34, 38.)  Her claims were denied by the Social Security Administration ("SSA") initially on March 26, 2010, and on reconsideration on August 10 and 16, 2010.  (AR 34, 38, 46, 51.)  Plaintiff then filed a request for a hearing before an ALJ.  (AR 54.)

On November 8, 2011, Plaintiff, represented by attorney Jon Hendricks, appeared for her hearing before ALJ Daniel Heely in Stockton, California, during which both Plaintiff and vocational expert ("VE") Stephen Schmidt testified.  (AR 322.)  On January 23, 2012, the ALJ issued a written decision denying Plaintiff's application and finding that Plaintiff was not disabled within the meaning of the Social Security Act and its regulations.  (AR 17-26.)  Plaintiff filed a request for review, which the Appeals Council denied on May 21, 2013.  (AR 6.)  On July 15, 2013, Plaintiff initiated the present action, seeking judicial review of the SSA's disability determination under 42 U.S.C. section 405(g).  (Dkt. No. 1.)

## FACTUAL BACKGROUND

Plaintiff suffers from a genetic disorder known as Marfan's Syndrome, which is the root cause of many secondary ailments.  As a result of this illness, Plaintiff has undergone

reconstructive chest surgery for a pectus deformity, spinal fusion surgery to correct scoliosis, and reconstructive jaw surgery. (AR 216.) Multiple back surgeries have left titanium rods, hooks, and other hardware in her back and hips, which she claims give her chronic pain and numbness in her dominant left arm – among other complications. (Dkt. No. 30 at 1.) Plaintiff alleges that her Marfan's Syndrome has caused her to be disabled from the date of her birth, December 14, 1990. (AR 79, 87.)

### A.    Medical Evidence

As a result of her Marfan's Syndrome, Plaintiff has seen a variety of physicians and primary care specialists to help cope with her symptoms. A discussion of the relevant medical evidence follows.

### 1.    Plaintiff's Medical History

The earliest medical records in the Administrative Record ("AR") date back to 2002, when Plaintiff was admitted to UC Davis Medical Center to have spinal fusion surgery to correct her idiopathic scoliosis. (AR 149-98.) Plaintiff's "Past Medical History" noted that she had previously undergone pectus repair in June 1996. (AR 150.) The posterior spinal fusion surgery was successfully completed on July 12, 2002, upon which her operating surgeon Dr. Daniel R. Benson commented that there was "a good correction of her curve at the conclusion of the procedure." (AR 170.) In a follow-up appointment on August 23, 2002, Dr. Benson once again noted that Plaintiff's spine had "corrected very nicely." (AR 175.) In a scoliosis study conducted on December 5, 2002, Dr. Sandra W. Gorges noted that Plaintiff "has a pectus excavatum deformity" and that there is "a residual leftward upper thoracic and right lower thoracic spinal curve" post fusion. (AR 180.) "No significant pelvic tilt" was noted. (*Id.*)

From June 16 to November 24, 2008, medical records from Manteca Medical Group, Inc. show that Plaintiff experienced chronic pain in her hip and back, and suffered from Marfan's Syndrome, mild valve prolapse, mild mitral regurgitation, muscular ventricular septal defect, a

United States District Court
Northern District of California

1    pectus excavatum, scoliosis, and TMJ.  (AR 204, 214.)  Plaintiff was consistently prescribed

2    Norco[1] to manage her pain.  (AR 206, 208, 210, 212, 214.)

3            On September 12, 2008, Plaintiff was seen at the office of pediatric cardiologist Dr.

4    Richard W. Gratian for a follow up of her Marfan's Syndrome.  (AR 200.)  Writing on behalf of

5    Dr. Gratian's office, Dr. Mark W. Cocalis noted that Plaintiff "has a small apical muscular

6    ventricular septal defect."  (*Id.*)  Plaintiff had used Holter monitors and loop recorders in the past

7    that had come back negative, but she continued to report episodes of chest pain and irregular heart

8    rate.  (*Id.*)  Dr. Cocalis noted a midsystolic click and ejection murmur in Plaintiff's heart, and an

9    echocardiogram showed a mild mitral valve prolapse with mild mitral regurgitation.  (*Id.*)  Dr.

10   Cocalis could not identify the cause of Plaintiff's irregular heart rate.  (*Id.*)

11           Medical records show that Plaintiff was seen at Mark Twain St. Joseph Hospital ("MTSJ")

12   from November 20, 2008 to August 18, 2009, where she consistently reported chronic pain in her

13   back and hip.  (AR 223-44.)  Plaintiff's initial appointment establishing care with MTSJ reported

14   that Plaintiff underwent reconstructive jaw surgery in October of 2007, and that she suffered from

15   "severe scoliosis," Marfan's Syndrome, mitral valve prolapse, ventricular septal defect, and heart

16   palpitations.  (AR 235, 236.) Plaintiff continued taking Norco for pain and was referred to a pain

17   management specialist.  (AR 235, 237.)  A radiology report on December 5, 2008 described

18   Plaintiff's spine condition as "moderate thoraco lumbar scoliosis."  (AR 234.)  On January 28,

19   2009, it was reported that Plaintiff started yoga, which she thought may be helpful, but that she

20   continued to take Norco on average two times a day to manage her pain.  (AR 227.)  At the time,

21   Plaintiff had experienced no heart palpitations since an event monitor was put on.  (*Id.*)  Plaintiff

22   returned to MTSJ on April 29 and August 18, 2009, reporting the same symptoms and seeking to

23   refill her Norco prescription.  (AR 223-24.)

24           Although the record is unclear as to where she was treated, medical records show that

25   Plaintiff was admitted to an emergency department on November 2, 2010, "after a sudden onset of

26

27   _____

     [1] Norco (acetaminophen and hydrocodone) is a narcotic pain reliever generally prescribed to
     alleviate moderate to severe pain.  *Norco*, DRUGS.COM, www.drugs.com/norco.html (last visited
28   Sept. 8, 2014).  Another common brand of this drug is Vicodin.  *Id.*

left-sided lower back and abdominal pain." (AR 309.) Plaintiff complained of a "stabbing and burning sensation" that began in her back and radiated through her abdomen to her left hip. (*Id.*) While noting her symptoms of Marfan's Syndrome, mitral valve prolapse, and scoliosis in her "Past Medical History," Plaintiff additionally stated that her VSD (ventricular septal defect) had been repaired. (*Id.*) Upon physical exam, Plaintiff was "alert" and "in no apparent distress." (*Id.*) Plaintiff's heart was at a regular rate with a systolic murmur, and the examining physician noted tenderness to palpation near the area of the umbilicus, extending down the left lower quadrant, and in the mid left flank. (AR 310.) Plaintiff had tenderness to palpation of the cervical spine, but was found to have full range of motion of the cervical spine without pain and 5/5 strength in all extremities. (*Id.*) After ruling out evidence of pneumothorax, the examining physicians could not determine the etiology of Plaintiff's abdominal pain or shortness of breath. (AR 306, 310.) Plaintiff was discharged in stable condition and given a prescription for Norco. (*Id.*)

From January 31 to June 15, 2011, Plaintiff visited nurse practitioner Sara M. Walsh of Forest Road Health and Wellness for primary healthcare services. (AR 299-300.) Nurse Walsh's initial assessment of Plaintiff was that "[s]he really is pretty healthy." (AR 299.) She also noted that Plaintiff "has a history of mitral valve prolapse and ventricular septal defect that was apparently resolving on its own." (*Id.*) Nurse Walsh referred Plaintiff to a Dr. Savage to manage her anxiety. (*Id.*) On March 7, 2011, Nurse Walsh reported that Plaintiff continued to manage her pain with 1-3 tablets of Norco a day, and that she participated in yoga twice a week. (AR 297.) Most of Plaintiff's pain was located in her lower back, hip, and left shoulder, and while she reported not noticing a result from prior physical therapy treatments, she was open to trying it again. (*Id.*) At their first appointment, and upon subsequent visits to resolve an upper respiratory infection and refill her Norco prescription, Plaintiff had a self-reported "4/10" pain in her back. (AR 288-91, 293, 299.) At all of these appointments, Nurse Walsh regularly noted that Plaintiff was "in no acute distress" and "very cooperative and pleasant." (AR 288-91, 293, 299.)

In a discharge report from SRMC Physical Therapy dated June 1, 2011, physical therapist Chad Ballard opined that Plaintiff "has continued to make progress in therapy the past couple weeks and reports having a lot more endurance and activity tolerance." (AR 312.) Plaintiff's back

United States District Court
Northern District of California

and shoulder pain were reportedly "quite a bit better," although she continued to experience "quite a bit of hip pain." (*Id.*) Mr. Ballard opined that Plaintiff "has much better self-efficacy managing her symptoms," and was "likely to continue to improve on an independent basis." (*Id.*)

On October 7, 2011, Plaintiff had a follow up appointment at the office of Dr. Gratian. (AR 313.) Writing from Dr. Gratian's office, Dr. Cocalis reported that Plaintiff is known to have a small apical muscular ventricular septal defect and will continue to have some unusual episodes of chest pain. (*Id.*) Dr. Cocalis described Plaintiff's medical history, and further documented that Plaintiff "is on no medication" and "is doing well at school." (*Id.*) A chest wall exam showed a mild pectus excavatum and a cardiac exam showed normal precordial activity. (*Id.*) Dr. Cocalis did not recognize any murmurs, clicks, or gallops in Plaintiff's heart. (*Id.*) An echocardiogram showed that Plaintiff has a mild mitral valve prolapse. (*Id.*) Dr. Cocalis' impression was that:

> [Plaintiff] has Marfan syndrome with mild mitral valve prolapse. She has had a tiny apical muscular ventricular septal defect in the past. I do not see the ventricular septal defect on today's echocardiogram or hear it. At this point in time, *she is cleared for all activity*, although we would like her to avoid isometric activity such as weight lifting, rock climbing, and rope climbing. [Plaintiff] does not need prophylactic antibiotics.

(*Id.*) (emphasis added).

### 2. Functional Capacity Evaluations

Apart from the routine medical visits that compose Plaintiff's medical record, Plaintiff also underwent several examinations to measure her functional capacity in support of her application for disability benefits. Two of the evaluations were completed by examining physicians Drs. Garfinkel and Sharma at the request of the SSA. Another was conducted by Dr. Jackson, a non-examining state agency physician who reviewed the documentary evidence of Plaintiff's file. The last evaluation was a questionnaire filled out by Plaintiff's primary care professional, Nurse Walsh.

### i. *Dr. Garfinkel*

As part of a prior application and at the request of the Department of Social Services, on April 7, 2009, Dr. Joseph M. Garfinkel performed a Complete Internal Medicine Evaluation based on an examination of Plaintiff and a review of her medical records. (AR 216.) Plaintiff was 18

United States District Court
Northern District of California

years old at the time of examination, and complained of multiple heart problems and chronic back, hip, and knee problems resulting from her Marfan's syndrome and her status post-back surgeries. (*Id.*)  Although Plaintiff indicated that her pain gets worse with everything—sitting walking, etc., and that she takes Norco for pain, Dr. Garfinkel noted that Plaintiff was in "no acute distress" at the time of examination.  (AR 216-17.)  While recognizing a pectus deformity from Plaintiff's status post-surgery, Dr. Garfinkel found her lungs to be clear and no tenderness in her chest.  (AR 218.)  Dr. Garfinkel noted a systolic murmur in Plaintiff's heart, and guarding and tenderness in Plaintiff's lumbar paraspinal muscles.  (*Id.*)  Plaintiff carried herself with an antalgic gait, but had normal range of motion and 5/5 strength in all extremities.  (AR 219.)

In assessing Plaintiff's functional capacity, Dr. Garfinkel opined that:

> The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can stand and walk for 2 hours in an 8-hour day.  The claimant can sit for 6 hours in an 8-hour day.  There are no postural, manipulative, visual, communicative or environmental limitations.

(AR 220.)

### ii.    Dr. Sharma

On February 25, 2010, Dr. Satish Sharma performed an Internal Medicine Consultation of Plaintiff at the request of the Department of Social Services.  (AR 245.)  Plaintiff was 19 years old at the time of examination, and complained of persistent back pain, joint pain in her hips, and recurrent heart palpitations.  (*Id.*)  Plaintiff specifically complained of lower back pain anytime she stood, walked, lifted anything, bent down, or sat in one position for a long period of time, and pain in her hips anytime she bears weight on her lower extremities.  (*Id.*)  She continued to take Norco for pain as needed.  (AR 246.)  Dr. Sharma found that Plaintiff was in "no acute distress" at the time of examination.  (AR 247.)  Dr. Sharma noted a systolic murmur in Plaintiff's heart, and tenderness to palpation in Plaintiff's thoracic lumbar spine.  (AR 247-48.)  Plaintiff also suffered from pain and decreased range of motion in the right hip, and pain in the left hip at full flexion. (AR 248.)  Strength was 5/5 in all muscle groups tested in the upper and lower extremities, but Plaintiff did walk with a limp in her right leg.  (*Id.*)

In assessing Plaintiff's functional capacity, Dr. Sharma opined that:

> [Plaintiff] has limitation in lifting to 10 pounds frequently and 20 pounds occasionally. Standing and walking limited to 4 hours with normal breaks. No limitation in holding, feeling, or fingering objects. No limitation in speech, hearing, or vision. Bending and stooping should be done occasionally. Sitting limited to 6 hours per day.

(AR 249.)

### iii.    Drs. Jackson & Reddy

Dr. W. Jackson, a non-examining state agency physician, reviewed the documentary evidence of Plaintiff's claim in conducting a Physical Residual Functional Capacity Assessment on March 16, 2010. (AR 252.) Dr. Jackson concluded that Plaintiff could lift or carry up to 10 pounds frequently and 20 pounds occasionally; could stand or walk up to 2 hours and sit up to 6 hours; could occasionally climb ladders, ropes, or scaffolds; and could occasionally stoop. (AR 253-54.)

On reconsideration of Plaintiff's claim, non-examining physician Dr. Sadda V. Reddy conducted a case analysis on August 2, 2010. (AR 257-58.) Dr. Reddy found Dr. Jackson's residual functional capacity ("RFC") determination to be appropriate and agreed to adopt it. (AR 258.)

### iv.    Nurse Walsh

On July 20, 2011, Nurse Walsh completed a "Residual Functional Capacity Questionnaire" of Plaintiff. (AR 314-15.) Nurse Walsh opined that Plaintiff's symptoms were severe enough to "often" interfere with attention and concentration, and that Plaintiff's impairments prevented her from sitting or standing for more than 45 minutes at a time. (AR 314.) In her opinion, Plaintiff could sit, stand, and walk between 2-3 hours in an 8 hour work day, respectively, and Plaintiff would require a job that would permit her to shift positions at will from sitting, standing, or walking. (AR 314-15.) Plaintiff would need to take unscheduled 5 to 15 minutes breaks, perhaps every hour, and could occasionally lift up to 10 pounds. (AR 315.) Plaintiff could never stoop or crouch, could kneel 2% of the time, and could climb stairs 5% of the time in an 8 hour work day. (*Id.*) Based on the totality of Plaintiff's impairments, Nurse Walsh opined that Plaintiff had 85% of the productivity level of a healthy individual, but that it would "depend[] on the job" as Plaintiff

United States District Court
Northern District of California

8

"needs flexibility." (*Id.*)  Nurse Walsh did not believe that Plaintiff had a significant limitation in doing repetitive reaching, handling, or fingering.  (*Id.*)

### B.    The ALJ Hearing

On November 8, 2011, Plaintiff appeared at her scheduled hearing before ALJ Daniel Heely in Stockton, California.  (AR 322.)  Plaintiff and VE Stephen Schmidt both testified at the hearing.  (*Id.*)

### 1.    Plaintiff's Testimony

At the ALJ hearing, Plaintiff testified that her Marfan's Syndrome causes three separate heart complications, and that she specifically suffers from heart episodes which cause her to become overheated and have difficulty breathing.  (AR 326.)  Plaintiff also testified that she has constant pain throughout her body and gets constant headaches.  (*Id.*)  She indicated that "about every day" she gets a pinched nerve feeling in her left shoulder that causes a sharp pain between her shoulder blade and spine that extends through her left arm, making "it difficult to write or hold anything." (*Id.*)  She was told by her doctor that this pain is caused by a rotation of her rib cage that resulted from her spinal fusion back surgery.  (AR 327.)  Plaintiff additionally testified that she has a constant back pain that occurs on a daily basis that goes down her spine and concentrates in her left hip.  (*Id.*)  If she sits for too long, she gets a pinched nerve in her left hip that causes a sharp pain and numbness down her leg.  (*Id.*)  Plaintiff testified that she could sit for no more than 25 minutes at a time without becoming uncomfortable, and could stand for no more than 10 to 15 minutes.  (AR 334.)  She was seeing a psychologist at least once a month and was taking Valium to combat her anxiety attacks for which she had been hospitalized twice.  (AR 328.)

At the time of the hearing, Plaintiff was a junior at CSU Stanislaus, lived at home with her sister and mother, and would drive to school three days a week.  (AR 324, 328, 330.)  She indicated that most of her free time is spent resting, watching TV, or reading books.  (AR 331.)  Plaintiff engages in light everyday activities such as microwaving food, folding clothes, and personal care, but does not vacuum, mop or sweep due to the pain it causes in her left shoulder and hips.  (AR 328-29.)  Plaintiff claims she has trouble breathing if she carries anything heavier than a jug of milk.  (AR 335.)

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.    Vocational Expert's ("VE") Testimony

The ALJ presented VE Stephen Schmidt with a hypothetical of an individual of Plaintiff's age, education, and work history who could sit for six hours but could not stand or walk more than two hours each in a normal workday; could occasionally lift and or carry less than 10 pounds; could never climb, balance, stoop, kneel, crouch, crawl, or work around hazards; and would need numerous unscheduled rest breaks throughout the workday more frequently than an employer would normally allow.  (AR 337.)  The VE testified that there were no full-time jobs available for such an individual.  (*Id.*)

The ALJ then presented the VE with another hypothetical, involving an individual who could sit six hours and could stand or walk two hours each with normal breaks; could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; could occasionally climb ladders, ropes, scaffolds; could occasionally stoop; but could never work around hazards like dangerous machinery or unprotected heights.  (*Id.*)  The VE testified that such an individual could not perform Plaintiff's past work of a fast food job.  (*Id.*)  The ALJ then asked if there were jobs in the California economy that could be done by such a hypothetical individual.  (*Id.*)  The VE testified that such an individual could perform the job of assembler (sedentary, DOT 726.684-110, SVP 2, of which 4,000 jobs exist locally), inspector (sedentary, DOT 726.684-050, SVP 2, of which 2,000 jobs exist locally), or sewing operator (light, DOT 787.685-010, SVP 2, of which 17,000 jobs exist locally).  (AR 337-38.)

### C.    The ALJ's Findings

In a January 23, 2012 decision, the ALJ found Plaintiff not disabled under sections 223(d) and 1613(a)(3)(A) of the Social Security Act using the five-step disability analysis.  (AR 17-26.)  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (AR 19.)  At the second step, the ALJ found that Plaintiff had the severe impairments of Marfan's Syndrome and status post scoliosis surgery.  (*Id.*)  At the third step, the ALJ found that Plaintiff did not have impairments or a combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 20.)  Between the third and fourth steps, the ALJ found that Plaintiff retained the Residual

Functional Capacity ("RFC") to perform light work limited to simple, routine, repetitive tasks, with the additional limitations of only occasional public contact; sitting limited to 6 hours; standing or walking limited to 2 hours each; occasional lifting or carrying up to 20 pounds and frequent lifting or carrying up to 10 pounds; occasional climbing of ladders, ropes or scaffolding; occasional stooping; and never working around hazards such as dangerous machinery or unprotected heights.  (*Id.*)  Thereafter, at the fourth step, the ALJ found that Plaintiff could not perform any past relevant work.  (AR 25)  At the fifth step, the ALJ found that there was other work in the national economy that Plaintiff could perform, such as the representative occupations of assembler, of which there exist 4,000 jobs, inspector, of which there exist 2,000 jobs, and sewing operator, of which there exist 17,000 jobs.  (*Id.*)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (AR 26.)

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. section 405(g), the Court has authority to review the ALJ's decision to deny benefits.  When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The Ninth Circuit defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;" it is "more than a mere scintilla, but may be less than a preponderance."  *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012) (internal citations and quotation marks omitted); *Andrews*, 53 F.3d at 1039.  To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews*, 53 F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.").

United States District Court
Northern District of California

United States District Court
Northern District of California

Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallenes*, 881 F.2d at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Commissioner*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

### DISCUSSION

The Court has "an obligation where the petitioner is *pro se* . . . to construe the pleadings liberally and to afford the petitioner the benefit of any doubt."  *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed."); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) ("[W]e continue to construe *pro se* filings liberally.").

Plaintiff's motion for summary judgment does not challenge any particular aspect of the ALJ's decision, and is largely a recitation of her current symptoms and limitations.  Plaintiff alleges that she suffers from anxiety and bouts of depression (Dkt. No. 30 at 3); thus, the Court will construe this claim as a challenge to the ALJ's finding that Plaintiff does not suffer from a mental impairment.  Her principal complaint, however, is that she "was declared able to work a repetitive job such as such 'sewing' and that is false" because she is "unable to do anything repetitive."  (Dkt. No. 30 at 1.)  The Court construes this claim as a challenge to the ALJ's finding that Plaintiff has the RFC to perform light work; specifically, as a challenge to (1) the weight the ALJ attributed to certain medical opinions, and (2) the ALJ's adverse credibility finding with respect to Plaintiff's claims of the intensity, persistence, and limiting effect of her symptoms.  *See*

*Holmlund v. Colvin*, No. 12-4481-EMC, 2014 WL 3965042, at *7 (N.D. Cal. Aug. 13, 2014) (construing *pro se* plaintiff's claim "that the ALJ did not adequately consider the limitations posed by her chronic pain . . . . as a challenge to the ALJ's adverse credibility finding.").

### A.      The ALJ's Mental Health Finding

Plaintiff's allegation that she suffers from anxiety and depression are construed as a challenge to the ALJ's determination that Plaintiff does not suffer from a medically determinable mental impairment.  The SSA regulations provide that a special procedure must be followed in evaluating the severity of mental impairments, the first step of which requires an ALJ to evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether" the claimant "has a medically determinable mental impairment(s)."  20 C.F.R. §§ 404.1520a(a)-(b).  A mental impairment must be established by objective medical evidence consisting of these "signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."  20 C.F.R. § 404.1508.

Here, at step two of his five-step analysis, the ALJ found that there was a "paucity of evidence related to a mental impairment," and objective evidence concerning Plaintiff's symptoms and daily activity did not support a finding that Plaintiff suffered from one.  (AR 20.)  Specifically, the ALJ noted that Plaintiff was found to be "alert and pleasant" on December 30, 2008, January 15, 2009, January 28, 2009, April 18, 2009, August 18, 2009, and she denied depression or anxiety on August 18, 2009.  (AR 19.)  Additionally, Plaintiff attended college and had a high GPA, used a computer and cell phone, drove a car, and performed normal activities of daily living.  (AR 20.)  Most important, however, was the fact that "claimant's attorney ha[d] failed to provide any documentation from any treating mental health professional."  (*Id.*)  The combination of these factors led the ALJ "to conclude that there is no mental impairment here." (*Id.*)

This finding is supported by substantial evidence in the record.  Although Nurse Walsh did include "anxiety disorder" in her assessment of Plaintiff (AR 293, 298, 300), the record contains no evidence from a licensed physician who diagnosed Plaintiff with anxiety or any other mental impairment.  *See* 20 C.F.R. § 404.1513(a) ("We need evidence from acceptable medical sources to

13

United States District Court
Northern District of California

1  establish whether you have a medically determinable impairment;" and nurse practitioners are not

2  considered "acceptable medical sources").  The record contains additional evidence that

3  contradicts Plaintiff's claims of anxiety and depression, including the "Social, Spiritual Psych

4  Assess" conducted by Mark Twain St. Joseph's Hospital that regularly found Plaintiff to have no

5  symptoms of depression, suicidal ideation, behavioral changes, or anxiety reactions.  (AR 223-25,

6  227, 229, 231, 235.)  Most noteworthy, however, is Plaintiff's personal statement submitted to the

7  SSA Appeals Council on August 20, 2012 wherein she herself notes that she has anxiety, but

8  states that she is "not claiming mental distress," but that she is "physically unable to complete

9  tasks due to physical conditions."  (AR 318.)

10  The record thus includes substantial evidence to support the ALJ's finding that Plaintiff

11  does not suffer from a mental impairment.

12  **B.    The ALJ's RFC Finding for Light Work**

13  The Court further construes Plaintiff's motion for summary judgment as challenging the

14  ALJ's determination that she has the RFC for light, repetitive work.  The "Medical-Vocational

15  Guidelines" of the Social Security regulations define RFC as "the maximum degree to which the

16  individual retains the capacity for sustained performance of the physical-mental requirements of

17  jobs." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c).  It is essentially a determination of what

18  the claimant can still do despite his or her physical, mental and other limitations.  *See* 20 C.F.R. §

19  404.1545(a).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the

20  record, including, inter alia, medical records, lay evidence, and the effects of symptoms, including

21  pain, that are reasonably attributed to a medically determinable impairment."  *Robbins v. Soc. Sec.*

22  *Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (internal citations and quotation marks omitted); 20

23  C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

24  The ALJ concluded that Plaintiff's RFC allows her to perform light work limited to simple,

25  routine, repetitive tasks.  (AR 20.)  He specifically found that Plaintiff could sit for 6 hours, and

26  stand or walk up to 2 hours each; could occasionally lift or carry 20 pounds, and frequently lift or

27  carry 10 pounds; could occasionally climb ladders, ropes, or scaffolding; could occasionally stoop;

28  and could never work around hazards such as moving machinery or unprotected heights.  (*Id.*)

United States District Court
Northern District of California

1    This finding was supported by the medical opinions of Drs. Cocalis, Garfinkel, Sharma and

2    Jackson.  (AR 21-24.)  In order for this RFC to be based on all the relevant evidence in the record,

3    however, the ALJ had to (1) discount the medical opinion of Nurse Walsh in her RFC

4    questionnaire, and (2) make an adverse credibility finding as to Plaintiff's claims of the intensity

5    and limiting effects of her symptoms.  (AR 23-24.)  The Court addresses each of these findings in

6    turn.

7                    **1.       Weight of Medical Opinion**

8          The Ninth Circuit has "developed standards that guide our analysis of an ALJ's weighing

9    of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

10   Specifically, a reviewing court must "distinguish among the opinions of three types of physicians:

11   (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

12   claimant (examining physicians); and (3) those who neither examine nor treat the claimant

13   (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The opinion of

14   each is accorded a different level of deference, as "the opinion of a treating physician is . . .

15   entitled to greater weight than that of an examining physician, [and] the opinion of an examining

16   physician is entitled to greater weight than that of a non-examining physician."  *Garrison v.*

17   *Colvin*, No. 12-15103, 2014 WL 3397218, at *13 (9th Cir. July 14, 2014).

18         Plaintiff did not offer evidence from a treating physician specifically evaluating her RFC.

19   However, the record contains a letter from her cardiologist, Dr. Cocalis (Dr. Gratian's office),

20   describing an October 2011 follow-up visit with Plaintiff for her Marfan Syndrome wherein he

21   cleared her "for all activity" other than isometric exercises.  (AR 313.)  Thus, there is no conflict

22   between the opinion of Dr. Cocalis and the evaluations conducted by Drs. Garfinkel (examining

23   physician), Sharma (examining physician), and Jackson (non-examining physician).  There is,

24   however, a conflict between the opinions of state agency physicians and those of Nurse Walsh,

25   Plaintiff's treating medical provider for six months.  (AR 314.)  Nurse Walsh submitted a RFC

26   Questionnaire on Plaintiff's behalf opining that Plaintiff could sit, stand, and walk between 2-3

27   hours in an 8 hour work day, she would need to take frequent 5-15 minute breaks, and would need

28

1    a job that would permit her to shift positions at will from sitting, standing, or walking.  (AR 314-

2    15.)

3              Under the relevant SSA regulations, "[o]nly physicians and certain other qualified

4    specialists are considered acceptable medical sources."  *Ghanim v. Colvin*, No. 12-35804, 2014

5    WL 4056530, at *5 (9th Cir. Aug. 18, 2014) (internal citations and quotation marks omitted); 20

6    C.F.R. § 404.1513(a).  Nurse practitioners, physician's assistants, and other health professionals

7    are considered "other sources."  20 C.F.R. § 404.1513(d).  "[A] nurse practitioner working in

8    conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner

9    working on his or her own does not."  *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).  There

10   is no evidence in the record that Nurse Walsh was working with a physician.  *See Bidad v. Colvin*,

11   No. 12-CV-06384-NJV, 2013 WL 4488695, at *3 (N.D. Cal. Aug. 20, 2013) ("Without evidence

12   in the record that Nurse Foster was closely supervised by a licensed physician when she treated

13   Plaintiff, Nurse Foster cannot be considered an 'acceptable medical source.'").

14           The ALJ must still evaluate opinions from nurse practitioners and "other sources," but

15   "may discount testimony from these 'other sources' if the ALJ gives reasons germane to each

16   witness for doing so."  *Ghanim*, 2014 WL 4056530, at *5.  Here, the ALJ gave "minimal weight"

17   to the RFC questionnaire completed by Nurse Walsh, finding that her "opinion conflict[ed] with

18   that of the State agency physicians who examined the claimant as well as that of Dr. Gratian . . ., a

19   treating physician."  (AR 24.)  In doing so, the ALJ cited the "paucity of clinical deficit noted

20   upon physical examinations and diagnostic studies," the "relatively routine treatment provided to

21   the claimant," and "the claimant's substantial activities of daily living" (attending college full-

22   time) as additional pieces of evidence that contradicted Nurse Walsh's assessment.  (*Id.*)

23           Thus, the ALJ considered Nurse Walsh's opinion when determining the severity of

24   Plaintiff's impairments, but concluded that "the assessment by Nurse Walsh is not supported by

25   the record, when considered as a whole."  (AR 24.)  This finding is supported by substantial

26   evidence.

27

28

United States District Court
Northern District of California

## 2.    Adverse Credibility Finding

At the ALJ hearing, Plaintiff testified that as a result of her spinal fusion surgery, she suffers from a sharp pain in her left shoulder that radiates down her arm, making it extremely difficult to use her left (dominant) arm for extended periods of time.  (AR 326-27.)  She also stated that she has random heart episodes which cause her to become overheated and have difficulties breathing, and that she gets constant headaches such that she has to lean against a wall to take the pressure off.  (AR 326.)  Plaintiff also allegedly suffers from constant back pain that focuses in her left hip and causes a deep throb in her hip and sharp pain down her leg.  (AR 327.)  Plaintiff testified that as a result of these symptoms she could sit for no more than 25 minutes at a time without becoming uncomfortable, or stand for more than 10 to 15 minutes at a time.  (AR 334.)  While she admitted that she drives to class three times a week, Plaintiff maintained that she scheduled her classes to allow her at least an hour in between classes to go to her car to rest and recline.  (AR 334.)

The SSA policy on determining the RFC directs ALJs to give "[c]areful consideration . . . to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone."  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  If the record establishes the existence of an impairment that could reasonably give rise to such symptoms, the "ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect."  *Robbins*, 466 F.3d at 883; *see also Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir. 2012) ("Because the RFC determination must take into account the claimant's testimony regarding his capability, the ALJ must assess that testimony in conjunction with the medical evidence.")

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible."  *Garrison*, 2014 WL 3397218, at *15.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks omitted).  "Second, if the claimant meets this first test, and there is no

United States District Court
Northern District of California

1    evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her

2    symptoms only by offering *specific, clear and convincing reasons* for doing so." *Id.* (emphasis

3    added) (internal citations and quotation marks omitted).  This "clear and convincing" standard is

4    not an easy requirement to meet, and "is the most demanding [standard] in Social Security cases."

5    *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).  "General findings are

6    an insufficient basis to support an adverse credibility determination."  *Holohan v. Massanari*, 246

7    F.3d 1195, 1208 (9th Cir. 2001).  Rather, the ALJ "must state which pain testimony is not credible

8    and what evidence suggests the claimant[] [is] not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918

9    (9th Cir. 1993).

10       Applying the two-step analysis, the ALJ found that Plaintiff's "medically determinable

11   impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's]

12   statements concerning the intensity, persistence and limiting effects of these symptoms are not

13   credible to the extent they are inconsistent with the above residual functional capacity

14   assessment."  (AR 24.)  In making this determination, the ALJ did not find that Plaintiff was

15   malingering; he thus was required to set forth specific, clear and convincing reasons for rejecting

16   Plaintiff's pain testimony.  *See Lingenfelter*, 504 F.3d at 1036.

17       Because symptoms regarding pain are difficult to quantify, the SSA regulations list

18   relevant factors to assist ALJs in their credibility analysis.  These factors include:

> (1) The individual's daily activities;
> (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> (3) Factors that precipitate and aggravate the symptoms;
> (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

27   20 C.F.R. § 404.1529(c)(3); *see also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)

28   ("In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,

1  inconsistencies either in his testimony or between his testimony and his conduct, his daily

2  activities, his work record, and testimony from physicians and third parties concerning the nature,

3  severity, and effect of the symptoms of which he complains.").  These factors are intended to

4  "ensure that the determination of disability is not a wholly subjective process, turning solely on

5  the identity of the adjudicator."  *Bunnel v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

6        Here, the ALJ justified his adverse credibility finding by generally referring to (1)

7  Plaintiff's "substantial activities of daily living and [ability] to attend college full time;" (2)

8  Plaintiff's "relatively routine medical treatment;" (3) Plaintiff's "ability to ambulate;" (4)

9  Plaintiff's pleasant demeanor and lack of "acute distress" despite alleging severe pain; and (5)

10  additional medical evidence.  (AR 24.)  Specifically, the ALJ made the following findings to

11  support his credibility determination:

12          As indicated above, the claimant has substantial activities of daily
13          living and is able to attend college fulltime.  She has received
        relatively routine medical treatment.  She has been noted to be able
14          to ambulate on numerous occasions.

15          Despite alleging severe pain, she has been noted to be pleasant on
        numerous occasions.  This includes a medical appointment on April
16          29, 2009 when she was reported to be pleasant despite reporting
        "stabbing" pain.  She was in no acute distress on February 25, 2010
17          and November 2, 2010.  On January 3, 2011, March 7, 2011, March
        22, 2011, March 30, 2011, she was pleasant and in no distress.  On
18          June 15, 2011 she was doing well, very pleasant and in no acute
        distress.

19          Objectively, she has 5/5 strength in all extremities.  On November 2,
        2010 she denied weakness of the lower extremities.  She was noted
20          to be "pretty healthy" on January 31, 2011.  She had no gross
        neurological deficits on January 31, 2011 and she was able to heel
21          and toe walk without difficulty.

22  (AR 24) (internal citations omitted).  This reasoning does not meet the Ninth Circuit's clear and

23  convincing standard because it fails to identify what portion of Plaintiff's testimony is not credible

24  and lacks "specific, clear and convincing reasons" for rejecting the severity of her symptoms.  *See*

25  *Lingenfelter*, 504 F.3d at 1036.  The Court addresses the deficiencies in each the ALJ's

26  justifications in turn.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### i.      Daily Activities

The ALJ failed to provide specific, clear and convincing reasons for why Plaintiff's "substantial activities of daily living" and ability to attend college full-time undermine her credibility.  Daily activities can form the basis of an adverse credibility determination if either (1) the claimant's daily activities contradict prior testimony or claimed limitations; or (2) the claimant's daily activities meet the threshold for physical functions that are transferable to a work setting.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

On the first ground, the ALJ did not identify *any* portion of Plaintiff's pain testimony that is in conflict with aspects of her daily living.  Plaintiff has consistently maintained that she cannot engage in continuous activity without regular breaks, and that she scheduled her college classes accordingly.  Without an explanation of how Plaintiff's pain testimony differs from her daily activities, this factor has no bearing on Plaintiff's credibility.  *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

As to the second ground, an "ALJ must make *specific findings* relating to the daily activities and their transferability to [the workplace to] conclude that a claimant's daily activities warrant an adverse credibility determination."  *Orn*, 495 F.3d at 639 (emphasis added) (internal citation and quotation marks omitted).  The ALJ did not do so here, as he failed to mention any specific "daily activities" or their transferability to a full-time job.

Thus, without further explanation from the ALJ, Plaintiff's daily activities cannot serve as a basis for discrediting her testimony.

### ii.      Routine Medical Treatment

The ALJ similarly failed to identify what about Plaintiff's treatment is "relatively routine," and in what way her course of treatment contradicts her pain testimony.  A conservative course of treatment can undermine allegations of debilitating pain.  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007); *see also* SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("[An] individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints.").  Even so, "[a] claimant cannot be discredited for failing to pursue non-

1   conservative treatment options where none exist." *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664

2   (9th Cir. 2010); *see also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir.

3   2008) ("[C]onservative course of treatment . . . is not a proper basis for rejecting the claimant's

4   credibility where the claimant has a good reason for not seeking more aggressive treatment.").

5          There is no guiding authority on what exactly constitutes "conservative" or "routine"

6   treatment.[2]  Several courts in this circuit have found the use of medication to control spinal pain,

7   and the absence of surgery or injections, to be "conservative" treatment.  *See, e.g.*, *Huerta v.*

8   *Colvin*, No. CV 13-05935-JEM, 2014 WL 1092467, at *7 (C.D. Cal. Mar. 18, 2014)

9   ("Conservative treatment is a legitimate basis for discounting a claimant's credibility . . . .

10  Plaintiff's diabetes and back pain were controlled with medication, and there is no evidence of

11  ongoing specialist care, physical therapy or surgery."); *Johnson v. Colvin*, No. 1:12-CV-524-AWI-

12  GSA, 2013 WL 2643305, at *13 (E.D. Cal. June 12, 2013) ("Plaintiff's spinal pain was treated

13  with medication and not injections or surgery" and this "[c]onservative course of treatment is a

14  proper basis to reject Plaintiff's subjective complaints.").  While these cases appear to lend

15  credence to the ALJ's finding, there is no evidence in the record that surgery or injections were an

16  available or viable option for Plaintiff's condition.  Furthermore, the ALJ described Plaintiff's

17  prescription medical use as "infrequent" following an appointment with Nurse Walsh (AR 23).

18  The ALJ's opinion is unclear as to whether the ALJ believed that Plaintiff's pain care was

19  "routine" because of infrequent use.  Plaintiff's medical records consistently show that she uses

20  Norco, a narcotic used to relieve moderate to severe pain, one to three times a day.  (AR 208, 210,

21  212, 215, 223-24, 231, 235, 237-38, 287-88, 291, 293.)  It is not obvious whether the consistent

22

23  _____

24  [2] The use of non-prescription medication, however, is consistently viewed as "conservative"
    treatment."  *See Stevens v. Colvin*, No. 1: 12-cv-00020-BAM, 2013 WL 1326621, at *10 (E.D.
    Cal. Mar. 29, 2013) ("Plaintiff testified he was not taking any prescription pain medication or

25  undergoing any other treatment for pain beyond September 2008, which casts serious doubt on his
    allegations of disabling pain."); *Ritchie v. Astrue*, No. EDCV 12-311 JC, 2012 WL 3020012, at *5

26  (C.D. Cal. July 24, 2012) ("[A]lthough plaintiff testified that she was unable to work due to pain
    in her back and hips, she also stated that she did not 'like' narcotics, and took only over-the-

27  counter pain medication (i.e. Tylenol, aspirin or Advil);" which cast doubt on the plaintiff's
    credibility.); *Boyce v. Astrue*, No. 6:11-cv-06278-SI, 2012 WL 4210628, at *7 (D. Or. Sept. 19,

28  2012) ("conservative treatment" consisted of "crutches, ice, and non-narcotic pain medication.").

United States District Court
Northern District of California

use of such a narcotic (for several years) is "conservative" or in conflict with Plaintiff's pain testimony, and therefore requires further explanation.

Thus, in light of the ALJ's failure to identify (a) how Plaintiff's treatment is routine, (b) how there are alternative less-conservative treatment options, or (c) how Plaintiff's treatment contradicts her alleged limitations, this factor does not have any bearing on Plaintiff's credibility.

### iii.    Ability to Ambulate

As with the ALJ's reliance on Plaintiff's daily activities, Plaintiff's ability to ambulate (walk around) carries no weight without an explanation as to how and why her ability to walk discredits her testimony.  "One does not need to be utterly incapacitated in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (internal citations and quotation marks omitted).  "[A]ctivities *such as walking* . . .  are not necessarily transferable to the work setting with regard to the impact of pain." *Id.* (emphasis added).  The ALJ did not explain how Plaintiff's ability to ambulate in a doctor's examination room is probative of her ability to sit or stand for extended periods of time, and its relevance is not obvious to the Court.  Thus, only if Plaintiff's "ability to ambulate" were inconsistent with her claimed limitations would it have "any bearing on [her] credibility." *Reddick*, 157 F.3d at 722.  The ALJ failed to offer clear and convincing reasons as to why that would be so.

### iv.    Pleasant Demeanor & "No Acute Distress"

The ALJ additionally supported his adverse credibility finding by reasoning that "[d]espite alleging severe pain," Plaintiff was observed to be "pleasant" and in "no acute distress" on numerous occasions.  (AR 24.)  There are two problems with this reasoning.

First, broadly characterizing Plaintiff's testimony as "alleging severe pain" is not specific enough to meet the Ninth Circuit's requirement that an ALJ identify "which pain testimony is not credible." *See Dodrill*, 12 F.3d at 918.  Plaintiff has alleged a variety of severe pain: pain in her left shoulder that radiates down her arm, pain in her back that radiates down to her left hip and leg, constant headaches, and random heart episodes which cause her to become overheated and have difficulties breathing.  (AR 326-27.)  Characterizing all these separate allegations as "alleging

United States District Court
Northern District of California

United States District Court
Northern District of California

1   severe pain" constitutes a general finding, which is an "insufficient basis to support an adverse

2   credibility determination."  *Holohan*, 246 F.3d at 1208.

3           Second, the Court is not persuaded by the ALJ's conclusion that Plaintiff's allegations of

4   pain are not credible because she was observed to be "pleasant" and in "no acute distress."  While

5   an agreeable disposition may be somewhat relevant to claims of depression or other mental

6   impairments, even in those instances it is improper to discredit a claimant's testimony simply

7   because of a pleasant demeanor.  *See, e.g.*, *Forester v. Colvin*, No. 3:13-CV-00984-RE, 2014 WL

8   2201027, at *6 (D. Or. May 27, 2014) ("Plaintiff was 'pleasant and cooperative' and demonstrated

9   a euthymic affect, 'despite her clear reports of depression' . . . . [but] [t]his is not a reason to find

10  Plaintiff less than fully credible as to her limitations.").  When the claimed limitations are

11  physical, as is the case here, it is even more problematic to discredit pain testimony due to a

12  pleasant character.  To hold otherwise would mean that a claimant need not be believed unless the

13  claimant acted in an agitated and disagreeable manner, an anomalous result.  Moreover, the ALJ's

14  discrediting of Plaintiff's pain testimony because she was not observed to be in "acute distress"

15  ignores that certain illnesses are not marked by "acute distress."  *See, e.g.*, *Reinertson v. Barnhart*,

16  127 F. App'x 285, 290 n.2 (9th Cir. 2005) ("One who suffers from fibromyalgia, a condition

17  marked by 'chronic pain throughout the body,' is not necessarily in 'acute distress.'").  Here,

18  Plaintiff is alleging "chronic pain" in her shoulder, back, and hips as a result of her surgeries.  That

19  she was not in "acute distress" does not necessarily contradict any of her testimony regarding her

20  pain and limitations.

21          Thus, the ALJ did not provide specific, clear, or convincing reasons as to how and why

22  Plaintiff's pleasant demeanor and lack of acute distress contradict her pain testimony.

23                          *v.      Additional Medical Evidence*

24          Finally, the ALJ's findings regarding Plaintiff's (1) strength in her extremities, (2) lack of

25  gross neurological deficits, (3) ability to heel and toe walk, and (4) perceived status as "pretty

26  healthy" all suffer from the same deficiencies laid out above.  In tallying all of this objective

27  medical evidence, the ALJ provides no reasoning as to what portion of Plaintiff's testimony stands

28  in conflict with this evidence.  Plaintiff is alleging chronic joint pain; therefore the muscular

strength in her extremities does not refute her claimed limitations.  The lack of gross neurological deficits would be relevant to a claim of mental impairment, but has no obvious bearing on Plaintiff's claimed physical pain.  Plaintiff's ability to walk has already been discussed above.  Lastly, Nurse Walsh's observation that Plaintiff appears "pretty healthy" is a general finding made at her initial appointment establishing care with Plaintiff.  Without further discussion, none of the aforementioned evidence is sufficiently specific, clear, or convincing enough to discount Plaintiff's pain testimony.

### C.        The Error Was Not Harmless

There is no affirmative evidence of malingering in the record and Plaintiff's impairments could reasonably cause the symptoms alleged.  Thus, the ALJ erred when he found Plaintiff less than fully credible because he did not provide legally sufficient reasons for doing so.  Such an error would be harmless if "the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).  Here, however, it is impossible for the Court to determine if the ALJ would have reached the same result had he credited Plaintiff's pain testimony – specifically, her need for rest breaks – as true.

At the ALJ hearing, Plaintiff testified that the most difficult aspect of working a job with her impairments would be the inability to take regular rest breaks.  (AR 333-34.)  When Plaintiff had worked in the past, "standing . . . for more than 15 minutes [would get her] heart [to] start racing," and she would have to eat every two hours to prevent her heart episodes from occurring more frequently.  (AR 333.)  Plaintiff claimed that she could sit for no more than 25 minutes at a time without becoming uncomfortable, and could stand for no more than 10 to 15 minutes.  (AR 334.)  While the ALJ did not identify *any* specific aspect of Plaintiff's testimony as incredible, the failure to address this particular limitation moves the ALJ's credibility finding out of the realm of harmless error.

"[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, *where it might be impossible to periodically rest* or take medication."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (emphasis added).  The same can

United States District Court
Northern District of California

United States District Court
Northern District of California

be said of sporadic college classes.  The difficulty in transferring such skills to the workplace was illustrated in the first hypothetical posed to the VE, who testified that there were no full time jobs available for an individual who, among other limitations, would need "numerous unscheduled rest breaks throughout the workday more frequently than an employer would normally allow."  (AR 337.)  Along with several other changes, this "unscheduled break" limitation was excluded from the second hypothetical posed to the VE, who testified about the availability of several sedentary and light work jobs.  (*Id.*)  The ALJ ultimately relied on this second hypothetical to determine that there were jobs available in the national economy that Plaintiff could perform.  (AR 25.)  Had the ALJ considered Plaintiff's testimony regarding her need for breaks credible, he would have been required to reach a more restrictive RFC assessment to reflect this limitation.  In light of the VE's answer to the first hypothetical, a more restrictive RFC may have ultimately resulted in a different disability determination.[3]  *See Ramirez v. Astrue*, No. 09-7405 JC, 2010 WL 3955833, at *4 (C.D. Cal. Oct. 8, 2010) ("Further restriction in the ALJ's assessment [of plaintiff's RFC] . . . would have been material, particularly in light of the vocational expert's testimony that no jobs would be available for a person with plaintiff's characteristics.").  Thus, because Plaintiff's pain testimony appears material to the ALJ's ultimate disability determination, it is impossible for the Court to regard the ALJ's lack of specific, clear and convincing reasons in his credibility finding as a harmless error.

### D.     Remand Is Appropriate

Where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000).  Because the ALJ's decision both (a) lacks any discussion as to how the objective evidence weakens Plaintiff's asserted limitations, and (b) fails to specify what portions of Plaintiff's testimony are not credible, the Court cannot properly

---

[3] Because the second hypothetical posed to the VE included several changes other than the "rest breaks" limitation, it is impossible to determine if that was the sole factor that caused the VE to answer differently.

United States District Court
Northern District of California

1    determine whether the ALJ's adverse credibility finding is supported by substantial evidence.  The

2    ALJ must "not only highlight what he deems to be significant facts, but also to explain why he

3    finds them to be significant." *Holmlund*, 2014 WL 3965042, at *14.  Here, the ALJ found that

4    Plaintiff's statements concerning her limitations were "not credible to the extent they are

5    inconsistent with the above residual functional capacity assessment."  Such boilerplate language is

6    insufficient[4] and constitutes legal error when not supported by "specific, clear and convincing

7    reasons." *See Holmlund*, 2014 WL 3965042, at *8-*9.  As explained above, the ALJ's credibility

8    determination was not supported by clear and convincing reasons as to what part of Plaintiff's pain

9    testimony is "inconsistent with the above residual capacity assessment," and why.  Moreover, the

10   failure to properly address Plaintiff's pain testimony – especially her alleged need for regular

11   breaks – is not a harmless error.  Given the VE's testimony on the availability of full-time jobs, it

12   is plausible that the ALJ could have come to a different disability determination had he considered

13   Plaintiff's pain testimony credible.

14       The Court makes no finding as to whether Plaintiff's pain testimony is credible; rather, it

15   concludes that the ALJ's present order fails to articulate specific, clear and convincing grounds for

16   rejecting Plaintiff's pain testimony, especially with regards to her testimony concerning her need

17   for regular breaks.

18

19

20

21   _____

22   [4] The problem with this language – that a "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" – is that it "fails to inform us

23   in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir.

24   2012); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).  Furthermore, the larger concern with this type of conclusory template is that:

25       the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting

26       effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets

27       things backwards.

28   *Bjornson*, 671 F.3d at 645.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

For the reasons explained above, the Court GRANTS Plaintiff's Motion for Summary Judgment (Dkt. No. 30) in part and DENIES Defendant's Cross–Motion for Summary Judgment (Dkt. No. 32).  The Court VACATES the ALJ's final decision and REMANDS for reconsideration consistent with this Order.

**IT IS SO ORDERED.**

Dated:  September 16, 2014

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge